UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TAMARA BOLEY,

                 Plaintiff,            Case No.: 11-10896
                                          Honorable George Caram Steeh
       v.                      Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                 Defendant.
_____/

**REPORT AND RECOMMENDATION ON PLAINTIFF'S
MOTION FOR REMAND AND DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [12, 15]**

Plaintiff Tamara Boley brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  Boley filed a "Motion for Remand Pursuant to Sentences Four and Six" of the Act, and the Commissioner filed a Motion for Summary Judgment, to which Boley responded.  [12, 15, 17].  Both parties' motions have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.       **RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge erred under sentence four of the Act by relying solely on the Medical-Vocational Guidelines in making his disability determination.  Instead, in light of Boley's significant nonexertional limitations, the ALJ should have received testimony of a vocational expert on the issue of whether those limitations conflict with and significantly erode the occupational base the ALJ found to exist.

The court also finds that the case does not warrant remand under sentence six of the Act solely to consider Boley's newly-tendered evidence of disability, as that evidence is both untimely and immaterial.  Accordingly, the court recommends GRANTING IN PART AND DENYING IN PART Boley's Motion for Remand Pursuant to Sentence Four and Six of the Act [12], DENYING the Commissioner's Motion for Summary Judgment [15], and REMANDING this case to the ALJ for further proceedings consistent with this recommendation.

## II.   REPORT

### A.   Procedural History

On March 14, 2007, Boley filed applications for DIB and SSI, alleging disability as of December 31, 2005.  (Tr. 85-95; 120).  Her claims were denied initially on June 5, 2007.  (Tr. 47).  Thereafter, Boley filed a timely request for an administrative hearing, which was held on August 21, 2009, before Administrative Law Judge ("ALJ") Thomas English.  Boley, represented by attorney James O'Neil, testified.  On September 24, 2009, ALJ English issued a written decision finding that Boley was not disabled.  (Tr. 12-24).  On January 10, 2011, the Appeals Council denied review.  (Tr. 1).  Plaintiff filed for judicial review of the final decision on March 7, 2011.  [1].

### B.   Background[1]

#### 1.   Disability Reports

In her disability reports, Boley stated that the conditions limiting her ability to work included ADHD, depression, diabetes and anger.  (Tr. 125).  She stated that she had been fired from her last two jobs due to depression and anger issues.  (*Id.*).  Boley reported that she was being treated for her diabetes, depression, ADHD and anger issues through a combination of

---

[1] Because Boley's appeal only deals with issues involving her alleged mental limitations, the court will limit its factual discussion to those areas.

medication and counseling and was currently taking the following medications for her mental state:  Cymbalta for depression and Methylon for ADHD.  (Tr. 127-129).  Boley and her boyfriend both reported that her daily activities included household chores like dishes, laundry, feeding animals, and taking her boyfriend's children to appointments. (Tr. 133-134; 141).  In her spare time, Boley would watch television and interact with the animals.  (Tr. 137; 145).  Her boyfriend reported that she was not organized and could not think straight, that she was depressed and cried all the time, and that she got upset easily.  (Tr. 134; 138; 144; 146).  He reported that she had trouble keeping her blood sugar in check because she could not stay focused.  (Tr. 135-36; 148).  Boley and her boyfriend also reported that she did not get along with authority figures well; she would break things or tell them off.  (Tr. 139; 147).  Boley reported that she had been fired from her last two jobs for anger issues, including breaking things and talking back to supervisors.  (Tr. 147).  The majority of Boley's jobs had been as a cashier, or in data entry or telemarketing.  (Tr. 149-155).

### 2. *Boley's Testimony at the Administrative Hearing*

Boley testified at the hearing in response to questions from the ALJ.  Boley's attorney did not ask any follow-up questions.  Boley testified that she had completed high school and took some data entry courses back in the 1970s or 80s.  (Tr. 30-31).  Her normal day would consist of waking up early to drive her boyfriend to work, as he did not have a license.  She would then go back to bed until approximately 9 a.m..  (Tr. 36).  She would shower, watch TV and sometimes drive to doctor appointments.  Boley would generally go to bed around 9 or 10 p.m..  (Tr. 30; 35-36).  She testified that she had difficulty sleeping at night but would often nap during the day.  (Tr. 36).  Despite the fact that her boyfriend had two children ages 14 and 15, Boley testified that she did not cook them meals or attend their school functions.  (Tr. 37).  She testified that she did

not have many friends and that her mother was the only person in her family with whom she spoke.  (Tr. 35-36).

Boley testified that the condition that led to her disability did not come on suddenly, but had been progressing for some time.  (Tr. 30).  She testified that she had been fired from a number of jobs because of her depression and anger issues.  (Tr. 31-32).  In her last position she had been fired for talking back to her supervisor.  (*Id.*).  In another job, she had been fired for breaking a piece of machinery in anger.  (Tr. 32).  Boley testified that her depression and personality disorder affected her ability to concentrate on her work and she would often cry.  (Tr. 34).  She also stated she was very unorganized.  (*Id.*).  Boley testified that she was taking Cymbalta and that she was attending regular therapy sessions.  (*Id.*).

### 3.    *Medical Evidence*

#### a.    *Treating Sources*

Boley's treating psychiatrist from September 2006 to March 2008, Dr. Gary Ralph, diagnosed Boley with dysthymic disorder and a past history of alcohol dependence versus alcohol abuse.  (Tr. 204-222; 267-279).  At her appointments, Boley routinely discussed problems she had with her boyfriend, as well as financial and transportation issues that were causing her stress.  (*Id.*).  Dr. Ralph noted frequently suggesting that Boley reduce her caffeine intake and attend therapy, as medication alone would not permit her to make great strides with her condition.  (*See e.g.* Tr. 210; 214-216).  He had originally been treating her disorders with Effexor, (Tr. 220), but then changed her medication to Cymbalta at her request.  (Tr. 217).  At an appointment on February 27, 2007, Boley told Dr. Ralph that she believed she had suffered from ADHD for many years.  (Tr. 208).  Dr. Ralph discussed medical options with her at that time, but noted that her high caffeine intake, in addition to the Cymbalta, could cause problems with

4

insomnia and increased anxiety when coupled with an ADHD medication. (*Id.*). Despite this, Dr. Ralph agreed to start Boley on methylphenidate for ADHD. (Tr. 209). At her next appointment, on March 6, 2007, Boley felt her symptoms were the same, so Dr. Ralph increased her dose of methylphenidate, but kept her Cymbalta the same. (Tr. 206-7). At the following appointment on March 15, 2007, Boley stated she believed this increased dosage of methylphenidate helped, as "her temper is under much better control and she finds it easier to think before she acts." (Tr. 204). She continued to note the benefits of the methylphenidate at her April 12, 2007 follow-up appointment. (Tr. 278). At that appointment she also informed Dr. Ralph that she was participating in anger management classes. (*Id.*). At her subsequent two visits, in June and July of 2007, Dr. Ralph noted that Boley's status had not changed, although she was frequently missing doses of her medications. (Tr. 275-76). Boley blamed this on her inability to get transportation to town for refills and for the lack of samples being made available to her. (Tr. 275). At Boley's last visit with Dr. Ralph, on March 3, 2008, her symptoms had not changed and her medication dosage remained the same. (Tr. 267).

Records from Boley's subsequent treating psychiatrist, Dr. Erin Ulano, indicate similar findings. At her first visit on April 5, 2008, Dr. Ulano diagnosed Boley with dysthymic disorder, borderline personality disorder and "suspected" ADHD, per her chart history. (Tr. 265-266). Dr. Ulano issued Boley a Global Assessment of Functioning (GAF) score of 55-65. She decided to continue Boley on her current dosage of Cymbalta and encouraged her to continue therapy and get into a dialectical behavioral therapy ("DBT") group. (Tr. 266). Dr. Ulano's notes state that she would "continue to de-emphasize the importance of medication, [and] stress the importance of therapy work in improvement of symptoms." (*Id.*). At a follow-up appointment on May 17, 2008, Dr. Ulano diagnosed Boley with ADHD, but did not prescribe any medication for the

condition at that time. (Tr. 262-63). In her notes, Dr. Ulano noted that Boley "noticed some difference in her mood symptoms when she remembers to take her prescription, versus on the days when she does not remember. She has noticed that she is less moody and calmer on the days she takes her medication." (Tr. 262). She continued to assess Boley's GAF at between 55 and 65. (*Id.*). At a June 14, 2008 follow-up appointment, Dr. Ulano's assessment of Boley did not change. (Tr. 260-261). Her diagnoses and medication dosage plan remained the same, as did her GAF score of 55-65. (Tr. 260). Dr. Ulano noted that Boley had been "dealing with her interpersonal stressors at home a little better. Crying spells, irritability, and overall depressed mood continue to improve slightly over her last visit." (*Id.*). At a visit on July 12, 2008, Dr. Ulano continued to note improvement in Boley's condition, due in some part to the fact that she was being compliant with her medication dosage. (Tr. 258). Dr. Ulano had suggested closing Boley's case and transferring her Cymbalta prescription to her primary physician, noting that "she has been stable on this medication for a lengthy period of time." (*Id.*). Dr. Ulano continued to assess Boley's GAF score at between 55 and 65. At an appointment on August 16, 2008, Boley told Dr. Ulano that she did not want her case transferred because her primary physician's office stated that samples of Cymbalta were not always available. (Tr. 256). At this appointment, Dr. Ulano noted continued improvement in Boley's condition, stating that "Tami's symptoms continue to stabilize . . . her mood seems to be a little more positive. At today's appointment, she was smiling and laughing at times." (*Id.*). Dr. Ulano further noted "Tami did make several statements at today's appointment that were indicative of a slightly more positive outlook on life than she has displayed in the past." (*Id.*). Dr. Ulano continued to assess Boley's GAF score at 55-65. (*Id.*). Boley's next appointment, according to the records, was on December 13, 2008. (Tr. 300-301). At this appointment she was much more agitated and she

frequently went off topic in her conversation with Dr. Ulano.  (Tr. 300).  Despite this agitated

mood, Dr. Ulano determined that Boley's "insight and judgment are moderate.  Attention, focus

and concentration appeared adequate to the interview although formal cognitive function testing

was not performed."  (*Id.*).  Dr. Ulano again assessed Boley's GAF at 55-65 and kept her

treatment plan in place.  (Tr. 301).  It appears from the record that Dr. Ulano did not treat Boley

after this date, as Boley had requested to see a psychiatrist who held office hours during the

week.  (Tr. 301).

　　　Boley's next follow-up was with psychiatric nurse practitioner Barbara Watson on March

2, 2009.  (Tr. 322-23).  The notes from that visit indicate that Boley reported being "95%

compliant" with her Cymbalta and that she noticed a marked difference when she failed to take

it.  (Tr. 322).  Boley also reported trouble sleeping, but admitted that if she napped less during

the day she might be able to sleep better at night.  (*Id.*).  While Boley expressed stress and

frustration, she admitted there were no new stressors in her life.  (*Id.*).  Watson found Boley's

thought processes logical and her insight and judgment "probably fair."  (*Id.*).  Watson's

diagnoses of Boley were the same as Dr. Ulano's, and she too assessed a GAF score of 55-65.

(Tr. 322-23).  At a follow-up appointment on May 26, 2009, Boley told Watson that she was

95% compliant with her Cymbalta and that "she thinks the medication is adequately treating her

symptoms."  (Tr. 324).  While Boley acknowledged having angry thoughts, she stated that the

"Cymbalta significantly helps those feelings."  (*Id.*).  Watson's GAF assessment and treatment

plan remained the same.  (Tr. 325).  However, on August 11, 2009, Watson filled out a "listing

of impairments" form for Boley, which essentially found that Boley satisfied one of the Act's

listed impairments, specifically listing § 12.08, "personality disorder."  (Tr. 338-39).  Without

any accompanying notes or explanation, Watson checked off that Boley had "deeply ingrained,

7

maladaptive patterns of behavior associated with . . . seclusiveness, persistent disturbances of mood or affect and intense and unstable interpersonal relationships and impulsive and damaging behavior." (Tr. 338). Watson also checked off that this behavior resulted in both marked difficulties in maintaining social functioning and repeated episodes of decompensation, each of extended duration. (*Id.*). In addition, Watson found that these behaviors resulted in "medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and . . . repeated episodes of decompensation, each of extended duration." (Tr. 339).

Boley also submitted records from her treating counselor, Lisa Cullen. The records span from August of 2006 to August of 2008. (Tr. 186-203; 240-254; 280-282). Cullen had diagnosed Boley with depression and anger-impulse control and the bulk of her treatment notes consisted of working with Boley to identify her role in the situations of which she complains, including fights with her boyfriend, problems with his children, failure to keep up with her medication, and failure to attend scheduled appointments. (*Id.*). Consistent throughout the notes is Cullen's attempts to get Boley to attend DBT sessions, which it appears Boley never did. (*Id.*). On October 16, 2007, Cullen completed a risk assessment for Boley. (Tr. 245-252). She found Boley's presentation, speech, and thought content to be within normal limits. (Tr. 246). Her thought processes, including her productivity and concentration, were also within normal limits, except for her insight, which was deemed fair. (*Id.*). Boley's mood was dysphoric and her affect labile, but her impulse control was deemed normal. (*Id.*). At that time, Cullen issued Boley a global assessment of functioning score of 45. (Tr. 252).

b.      <i>Consultative and Non-Examining Sources</i>

On May 18, 2007, Dr. Wayne Hill conducted a psychiatric review of Boley beginning from her alleged onset date of December 31, 2005.  (Tr. 224-237).  He found that while she had an impairment, specifically an axis I diagnosis of dysthymic disorder, it was not severe and did not constitute a disability.  (Tr. 224; 227).[2]  Dr. Hill found that Boley's condition only mildly affected her activities of daily living, her ability to maintain social functioning and her ability to maintain concentration, persistence or pace.   (Tr. 234).   He found no episodes of decompensation.  (<i>Id.</i>).

c.      <i>New Evidence Submitted After ALJ Decision</i>

After the ALJ rendered his decision, Boley obtained from Dr. Ulano additional evidence regarding her mental state.  (Tr. 340-343).  This evidence, obtained on October 10, 2009, was in the form of two checklists, very similar to the "listing of impairments" form filled out by nurse Watson, which indicated, without any notes or explanation that Boley satisfied the CFR's listing for  a personality disorder (§12.08) and possibly an affective disorder (§12.04).  (<i>Id.</i>).  On the first form, Dr. Ulano checked off boxes indicating that Boley satisfied the criteria for a listed personality disorder, specifically that she had "deeply ingrained, maladaptive patterns of behavior associated with . . . intense and unstable interpersonal relationships and impulsive and damaging behavior," resulting in "marked restriction of activity of daily living, marked difficulties in maintaining social functioning [and] marked difficulties in maintaining concentration, persistence or pace."  (Tr. 342).  On the second form, listing the criteria for an affective disorder, Dr. Ulano checked boxes representing that Boley had a "medically documented persistence, either continuous or intermittent of . . . depressive syndrome,"

---

[2] Dr. Hill also noted a deferred axis II diagnosis of borderline personality disorder.  (Tr. 236).

characterized by the following: sleep disturbance; decreased energy; and difficulty concentrating or thinking. (Tr. 340-341). According to her form, this syndrome resulted in "marked restriction of activities of daily living, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace." (*Id*).

### C.   Framework for Disability Determinations

Under the SSA, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The SSA defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

10

*Scheunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.   The ALJ's Findings

The ALJ, using the five step process just outlined, determined that Boley was not disabled under the provisions of the Act because, despite her severe impairments, she retained the residual functional capacity to perform a significant number of jobs in the national economy. (Tr. 16-24).  At Step One, the ALJ found that Boley had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 18).  At Step Two, the ALJ determined that Boley had the following severe impairments:  "affective disorder/depression, borderline personality disorder, and diabetes mellitus."  (*Id.*).

At Step Three, the ALJ determined that Boley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the CFR.  (Tr. 19).  He then evaluated the functional limitations resulting from Boley's mental impairments in four areas, as required by 20 C.F.R. § 404.1520(a).  He found that, "[i]n activities of daily living, the claimant has mild restriction.  In social functioning, the claimant has moderate difficulties.  With regard to concentration, persistence or pace, the claimant has mild to moderate difficulties."  (Tr. 19).  He found that she had experienced no episodes of decompensation.  (*Id.*).  The ALJ rejected Nurse Watson's "listing of impairments" form (Tr. 338-39) that found Boley met the criteria for a listed disability, namely personality disorder,

11

finding it "inconsistent with the overall medical evidence of record and not even supported by specific findings." (Tr. 22). He noted that Watson had specifically checked off that Boley had suffered from patterns of behavior associated with seclusiveness, persistent disturbances of mood or affect and intense and unstable interpersonal relationships and impulsive and damaging behavior, but that there were no records to support these statements. (*Id*). Nurse Watson also found that Boley suffered from repeated episodes of decompensation. The ALJ noted, however, that Boley had no evidence of having been hospitalized for a mental health condition. (*Id.*).

The ALJ then determined Boley's RFC. After reviewing Boley's testimony as well as the various medical records, he determined that she had the capacity:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: Claimant is limited to work activity that is unskilled; only minimal contact/interaction with co-workers; minimal contact with and minimal direction from, a supervisor; and work requiring only brief and superficial contact with the public.

(Tr. 19). At Step Four, the ALJ determined that, based on Boley's RFC, she could not perform any of her past, relevant work. (Tr. 23). At Step Five, the ALJ concluded that, based on her age, education, work experience, and RFC, there were a significant number of jobs in the national economy that Boley could still perform, specifically unskilled work at all exertional levels, and thus she was not disabled under the Act. (*Id.*). He found that, while Boley's "ability to perform work at all exertional levels has been compromised by nonexertional limitations" her nonexertional limitations "have little or no effect on the occupational base of unskilled work at all exertional levels." (*Id.*). In his decision, the ALJ stated that he was using the Medical-Vocational Guidelines as a "framework" for his analysis. (*Id.*). However, the ALJ did not receive vocational expert ("VE") testimony, nor did he cite other specific evidence in support of his conclusion about the effect of Boley's nonexertional limitations.

E.      **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

In her motion, Boley makes three arguments: (1) that the ALJ's use of the Medical-Vocational Grids alone in making his determination of the number of jobs available to her was error in light of her limitation in interactions with the public, co-workers and supervisors, and thus his decision was not supported by substantial evidence; (2) that the ALJ's RFC assessment failed to take into account Boley's mild to moderate limitations in concentration, persistence and pace ("CPP"); and (3) that the case should be remanded back to the ALJ to consider the new evidence she procured after he rendered his decision.

#### 1.    *The ALJ's Use of the Medical-Vocational Grids*

Boley argues that the ALJ's failure to elicit testimony from a VE about the number of jobs available to her, given her nonexertional limitations, was error.  As stated above, once an ALJ determines that a claimant cannot return to his or her past relevant work, the burden shifts to the Commissioner to show that, based on the claimant's age, education, work experience, and RFC, a significant amount of other work exists in the national economy that the claimant can

perform. In making this determination, an ALJ may, occasionally, rely on the Medical-Vocational Guidelines, otherwise known as "the grids." *Ziegler v. Sullivan*, 894 F. 2d 1337 (6th Cir. 1990). *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). However, the grids only directly apply to exertional limitations, and reliance on the grids is generally inappropriate where the claimant, like Boley here, suffers only from nonexertional limitations. *Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 282 (6th Cir. 1985); *Abbott v. Sullivan*, 905 F. 2d 918, 927 (6th Cir. 1990); 20 C.F.R. § 416.969a(c)(2). If an ALJ seeks to use the grids in the face of a nonexertional impairment, he or she must find that the impairment does not significantly reduce the occupational base of work at the exertional level the ALJ has found appropriate. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528-29 (6th Cir. 1981). This can be done by finding that the nonexertional impairment is not sufficiently severe.

The Sixth Circuit has found that a nonexertional limitation only precludes the use of the grids where it is "severe enough to alter the conclusion that the claimant could do a full range of work at a designated level." *Allison v. Apfel*, No. 99-4090, 2009 U.S. App. LEXIS 22689 at *10 (6th Cir. Aug. 30, 2009). However, neither the "mere allegation of a nonexertional limitation," nor the presence of only a slight nonexertional limitation, is sufficient. *Id.*; *Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). In addition, even if the nonexertional limitation is severe, it will only preclude use of the grids where "the characteristics of the claimant do not identically match the descriptions in the grid[s]," *Moon*, 923 F.2d at 1181, *i.e.*, where the severe nonexertional limitation does not significantly erode the occupational base of work at a given exertional level. In order to conclude the nonexertional impairment does not significantly erode the occupational base, the ALJ must support his or her finding with "reliable evidence of some kind." *Shelman v. Heckler*, 82 F.2d 316, 321 (6th Cir. 1987).

The cases on this topic generally fall into two categories: (1) cases which examine whether an ALJ's conclusion that the claimant's alleged nonexertional limitations were not supported by substantial evidence in the record such that the ALJ did not need to consider them or incorporate them into his or her RFC assessment; and (2) cases which examine whether, once the ALJ found the nonexertional limitation to be severe and incorporated it into the RFC, that nonexertional limitation has any actual effect on the occupational base of jobs at a given exertional level. *See Rutherford v. Barnhart*, 399 F.2d 546, 554 n. 8 (3rd Cir. 2005) (noting a similar dichotomy in cases involving the sufficiency of the hypothetical questions posed to a VE. In the former class of cases, where a claimant alleges the ALJ erred by not including the claimant's alleged nonexertional impairment in his or her RFC assessment, the courts generally look to the record to determine whether substantial evidence exists to support the ALJ's finding that the alleged nonexertional limitations were not sufficiently severe. *See Kimbrough*, 801 F.2d at 797 (conclusion that there were no nonexertional limitations supported by objective medical evidence); *Atterberry*, 871 F.2d at 572 (no evidence to support alleged psychological impairment, so reliance on grids appropriate); *Ziegler*, 894 F.2d at 1337 (claimant failed to support with medical evidence allegation that mental impairment was sufficiently severe to limit occupational base).

In the second class of cases, because the ALJ has already determined that the nonexertional limitation is significant and translated it into a limitation in the RFC assessment, the question becomes whether the limitations the ALJ imposed on the claimant in the RFC conflict with the skill requirements of the occupational base the ALJ identified as appropriate. If so, and if the nonexertional limitations in the RFC actually have a significant effect on occupational base of jobs at a given exertional level, the ALJ's final determination of disability

may not rely solely on the grids improper. *See e.g. Shelman*, 821 F.2d at 321 (reliance on grids was improper where ALJ found nonexertional environmental limitation but concluded without support that it did not substantially erode job base). Stated another way, "[a]t issue is whether the ALJ had substantial evidence, relying solely on the grids, to appropriately determine the existence of a significant number of jobs in the national economy that the [claimant] is able to do in light of her nonexertional limitations." *Cox v. Astrue*, No. 10-5021, 2010 U.S. Dist LEXIS 81134 at *27-28, 2010 WL 3120593 (W.D. Wash. July 9, 2010) *adopted by* 2010 U.S. Dist. LEXIS 81131, 2010 WL 3120666 (W.D. Wash. Aug 7, 2010); *see also Adkins v. Comm'r of Soc. Sec.*, 251 Fed. Appx. 346, 350 (6th Cir. 2007) (stating the inquiry as "whether or not the government has produced substantial evidence showing that jobs exist in the national economy which Plaintiff can perform").

This second scenario is the one applicable to this case. Here, the ALJ cited to records documenting Boley's issues with interpersonal relationships. He noted that the records showed that Boley was "quite irritable" and was attending anger management classes. (Tr. 20). Her temper was better controlled when she was on medication, but she was not good at remembering to take it. (*Id.*). Her GAF score was between 55 and 65, which the ALJ considered evidence of mild to moderate difficulties in social, occupational or school functioning. (*Id.*). He noted that Boley had testified that she was generally an angry and irritable person and that "she has tried to work at jobs but her anger and problems cause her to get fired." (Tr. 21). She testified that she did not have many friends and that her mother was her only friend. (Tr. 22).

The ALJ found this testimony credible to the extent that it did not conflict with his RFC assessment. (*Id.*). The ALJ specifically found that Boley had moderate limitations in social functioning, and incorporated these limitations into his RFC assessment when he determined

17

that, while she could perform work at all exertional levels, she was limited to "unskilled [work] with only minimal contact/interaction with co-workers; minimal contact with, and minimal direction from, a supervisor; and work requiring only brief and superficial contact with the public."  (Tr. 19).  Thus the question here is not whether the ALJ found sufficient evidence to support Boley's nonexertional impairments on interaction with co-workers, supervisors and the public -- indeed he did since he incorporated them as limitations into his RFC assessment -- but whether the limitations he found to exist significantly erode the base of unskilled work at a given exertional level, in this case all exertional levels.

The ALJ, in his decision, found they did not.  Relying on SR 85-15, he stated:

> The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations.  However, these limitations have little or no effect on the occupational base of unskilled work at all exertional limitations.  A finding of 'not disabled' is therefore appropriate under the framework of section 204.00 of the Medical-Vocational Guidelines.

(Tr. 23).  The ALJ, however, did not provide any evidence supporting this conclusion.  It is true that, by definition, certain classes of work encompass a number of different nonexertional limitations such that reliance on VE testimony is unnecessary.  *See e.g. Kinney v. Sec'y of Health & Human Servs.*, No. 91-1752, 1992 U.S. App. LEXIS 979 at *5 (6th Cir. Jan. 22, 1992) (finding that restrictions regarding stress, excessive physical strength and overtime consistent with the demands of sedentary work such that use of the grids was proper).  The regulations have outlined the skills required to perform the different classes of work addressed in disability cases.  Thus, the court must determine whether the skills required for unskilled work are congruent with Boley's nonexertional limitations.[3]

---

[3] The Commissioner argues that no evidence was necessary as the conclusion that the unskilled occupational base is not significantly compromised by Boley's non-exertional limitations is "within the common knowledge and experience of ordinary men, and requires no substantiation

SSR 85-15, which governs the application of the grids in the face of solely nonexertional limitations cautions that "the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis." 1985 SSR LEXIS 20 at *1, 1985 WL 56857 (Nov. 30, 1984).   Unskilled work at all exertional levels is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . .  [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. § 416.968(a).

Although unskilled work deals primarily with objects and not data or people, SSR 85-15, 1985 SSR 56857 at *12, it does require the following skills:  "the abilities, (on a sustained basis) to understand, carry out, and remember simple instructions; ***to respond appropriately to supervision, coworkers, and usual work situations***; and to deal with changes in a routine work situation."  SSR 85-15, 1985 SSR LEXIS 20 at *11 (emphasis added).  The definition further states that, "[w]here there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of

by a vocational expert."  (Def. Br. at 4 (quoting *Ackley v. Sec'y of Health & Human Servs.*, No. 90-3501, 1991 U.S. Dist. LEXIS 3100, 1991 WL 21976 (6th Cir. Feb. 21, 1991) (holding that the existence of low stress jobs is a fact that is within the common knowledge and not one requiring VE testimony)).  However, the cases to which the Commissioner cites do not deal with the non-exertional limitation of an inability to interact with others, but with stress.  It is true that the Sixth Circuit has held that the effects of stress in certain types of work can be considered common knowledge.  *See e.g. Clinker v. Apfel*, No. 99-4179, 2000 U.S. App. LEXIS 22251 at *9, 2000 WL 123435 (6th Cir. Aug. 22, 2000); *Kinney*, 1992 U.S. App. LEXIS 979 at *5; *Harrington v. Sec'y of Health & Human Servs.*, 810 F.2d 210 (6th Cir. 1986).  However, no authority was provided to support extending the Sixth Circuit's view on low-stress jobs to the wholly different nonexertional limitations Boley was found to have, and the court declines to do so.  *See Little v. Comm'r of Soc. Sec.*, 780 F. Supp. 2d 1143, 1153 (D. Or. 2011) (finding that restriction on public interaction was not the same as restriction on interaction with coworkers and supervisors, and latter required for unskilled work); infra, pp. 21-22).

unskilled work." (*Id.*).  Therefore, so long as a claimant's nonexertional limitations do not affect the skills needed for unskilled work, their presence, by definition, does not significantly erode the job base, and reliance on VE testimony or other evidence is not necessary to substantiate a finding that a significant number of jobs exist that the claimant can perform. *Ortiz v. Sec'y of Health & Human Servs.*, 890 F. 2d 520, 526 (1st Cir. 1989) (finding that as long as nonexertional limitation "is substantially consistent with performance of the full range of unskilled work" the grids may be used); *see also Allison* 2000 U.S. App. LEXIS 22689 at *14 (finding reliance on grids appropriate because limitation to simple, repetitive and routine work was within definition of unskilled work).  Thus, the issue here is whether Boley's two nonexertional limitations – brief and superficial interaction with the public, and minimal interaction with co-workers and supervisors – are congruent with the definition of unskilled work.

a.    *Brief and Superficial Public Contact*

As stated above, unskilled work is considered work that deals primarily with objects, rather than data or people.  Courts have found that a limitation to infrequent or minimal public contact is congruent with that definition of unskilled work such that the limitation does not erode the occupational base and the use of the grids is appropriate. *See Hannan v. Astrue*, 2009 U.S. Dist. LEXIS 79778 at *28-29, 2009 WL 2853578 (D. Mass. Sept. 2, 2009); *Stehr v. Astrue*, 2011 U.S. Dist. LEXIS 50199 at *11, 2011 WL 1790180 (W.D. Okla. March 24, 2011) *adopted by* 2011 U.S. Dist. LEXIS 50111, 2011 WL 1771049 (W.D. Okla., May 10, 2011); *Lester v. Astrue*, No. 09-01730, 2011 U.S. Dist. LEXIS 31874 at *29-29, 2011 WL 902344 (E.D. Cal. March 14, 2011); *Adkins v. Astrue*, No. 10-60, 2011 U.S. Dist. LEXIS 13595 at *12-13, 2011 WL 652508 (E.D. Va. Feb. 10, 2011); *Ramirez v. Astrue*, No. 09-01508, 2010 U.S. Dist. LEXIS 106082 at *32, 2010 WL 3734002 (E.D. Cal., Sept. 21, 2010); *Black v Astrue*, No. 09-599, 2010 U.S. Dist.

20

LEXIS 55094 at *20, 2010 WL 2306130 (E.D. Va. April 26, 2010) *adopted by* 2010 U.S. Dist. LEXIS 55149, 2010 WL 2306136 (E.D. Va. June 3, 2010). Thus, Boley's limitation to "only brief and superficial contact with the public" (Tr. 19) did not preclude the ALJ from relying on the grids.

   b. *Minimal Contact with Co-Workers and Minimal Contact with, and Direction from, Supervisors*

  The effect of Boley's other nonexertional limitation, involving contact with co-workers and contact with and direction from supervisors, is a different case. As stated above, one of the requirements of unskilled work is the ability "to respond appropriately to supervision [and] coworkers . . . ." 20 CFR § 404.1521; SR 85-15, 1985 SSR LEXIS 20 at *11. The ruling further states that "a substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." 1985 SSR LEXIS 20 at *11. In fact, as Example 1 in the ruling demonstrates that, "A person whose vocational factors of age, education, and work experience would ordinarily be considered favorable would have a severely limited occupational base if he or she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations." *Id.* In addition, 20 CFR § 404.1545 states that "[a] limited ability to carry out certain mental activities, such as limitations in . . . responding appropriately to supervision, co-workers and work pressures in a work setting, may reduce your ability to do past work and other work."

  Where an ALJ specifically limits a claimant's ability to interact with co-workers and supervisors, a number of courts have held that such a limitation conflicts with the basic requirements of unskilled work and has the potential to significantly erode the occupational base. *See Galinski v. Astrue*, No. 11-516, 2011 U.S. Dist. LEXIS 151424 at *45-47, 2011 WL 7070323 (W.D. Wash. Dec. 16, 2011) *adopted by* 2012 U.S. Dist. LEXIS 4470, 2012 WL

113485 (W.D. Wash. Jan. 12, 2012); *Gurney v. Astrue*, No. 09-153, 2009 U.S. Dist. LEXIS 122088 at *9-10 (D. Me. Dec. 31, 2009) *adopted by* 2010 U.S. Dist. LEXIS 4535, 2010 WL 323912 (D. Me. Jan. 20, 2010); *Stark v. Astrue*, No. 07-6465, 2009 U.S. Dist. LEXIS 72807 at *18-21, 2009 WL 2566723 (N.D. Cal. Aug. 18, 2009); *Zoto v. Astrue*, No. 07-2972, 2008 U.S. Dist. LEXIS 11355 at *19-20, 2008 WL 2620906 (N.D. Cal. July 1, 2008).  This is so even when the occupational base is comprised of jobs at all exertional levels.  *See Little*, 780 F. Supp. 2d at 1153 (holding restriction on interaction with coworkers and supervisors, could affect occupational base of unskilled work at all exertional levels); *Shankles v. Astrue*, No. 09-1258, 2010 U.S. Dist. LEXIS 132145 at *43-44, 2010 WL 5169077 (E.D. Cal. Dec. 14, 2010) (finding unskilled work requires ability to interact with coworkers and supervisors and lack of that ability could affect occupational base at all exertional levels so reliance on grids inappropriate ); *Cox*, 2010 U.S. Dist. LEXIS 81134 at *28 (finding limitation on contact with others incongruent with definition of unskilled work and could affect occupational base at all exertional levels); *D'Anna v. Comm'r of Soc. Sec.*, No. 08-1640, 2009 U.S. Dist. LEXIS 121243 at *22-24, 2009 WL 5214998 (M.D. Fla. Dec. 30, 2009) (limitation on proximity to others incongruent with definition of unskilled work and could have effect of eroding occupational base at all exertional levels).

To be sure, several courts have drawn the opposite conclusion under similar facts.  *See e.g. Dollins v. Astrue*, No. 08-141, 2008 U.S. Dist. LEXIS 73055, 2008 WL 4402208 (E.D. Ky. Sept. 24, 2008) (finding restriction on significant interaction with others would not erode occupational base such that use of grids was appropriate); *Mitchell v. Astrue*, No. 11-139, 2011 U.S. Dist. LEXIS 135816 (W.D. Okla. Oct. 12, 2011) *adopted by* 2011 U.S. Dist. LEXIS 131412 (W.D. Okla. Nov. 14, 2011) (finding "routine supervision" synonymous with unskilled work such that use of grids appropriate); *Lancaster v. Astrue*, No. 10-88, 2010 U.S. Dist. LEXIS

80627, 2010 WL 3211984 (W.D. Wash. July 19, 2010) *adopted by*  2010 U.S. Dist. LEXIS 80629, 2010 WL 3211980 (W.D. Wash. Aug. 10, 2010) (incidental contact with coworkers congruent with definition of unskilled work and thus use of grids was appropriate);. *Summers v. Comm'r of Soc. Sec.*, No. 08-1309, 2009 U.S. Dist. LEXIS 58750, 2009 WL 2051633 (E.D. Cal. July 10, 2009) (no frequent co-worker contact congruent with definition of unskilled work so use of grids was appropriate); *Atkinson v. Barnhart*, No 05-471, 2006 U.S. Dist. LEXIS 37948, 2006 WL 1455473 (D. Nev. May 19, 2006) (inability for frequent co-worker contact congruent with definition of unskilled work thus use of grids was appropriate).  However, in all of those cases other than *Mitchell*, the courts supported their decisions only with the regulation's language that unskilled work generally deals with objects rather than people.  *See e.g. Atkinson*, 2006 U.S. Dist. LEXIS 37948 at *2; *Summers*, 2009 U.S. Dist. LEXIS 58750 at *68; *Lancaster*, 2010 U.S. Dist. LEXIS 58750 at *31.  None addressed the specific proposition that a limited ability to respond to supervisors and/or co-workers "would severely limit the potential occupational base." SSR 85-15; 1985 SSR LEXIS 20 at *11.  *See also* 20 CFR § 404.1545 ("[a] limited ability to carry out certain mental activities, such as limitations in . . . responding appropriately to supervision, co-workers and work pressures in a work setting, may reduce your ability to do past work and other work.").  Since Boley faced a limitation on supervisor/co-worker interaction, the court finds these cases to be less helpful than the ones discussed above which expressly considered the impact of the limitation on the potential occupational base.

*Mitchell*, which did address the co-worker/supervisor interaction limitation, is distinguishable because the district court found that the ALJ had made "specific, supported findings – unchallenged on appeal – as to why the [supervisor/co-worker interaction] impairments would not significantly erode the occupational base."  2011 U.S. Dist. LEXIS

135186 at *13-14.  Here, in contrast, the ALJ did not expound on why he believed Boley's limitations would not erode the occupational base of unskilled work.  As a result, the court has no way of knowing whether the ALJ found her limitations congruent with the definitional requirements of that work, and it is not at liberty to engage in its own *post-hoc* rationalization of the ALJ's decision.  *See Dues v. Astrue*, No. 09-1951, 2010 U.S. Dist. LEXIS 45475 at *19-20, 2010 WL 1855763 (N.D. Ohio May 10, 2010) (collecting cases for proposition that court cannot accept justifications for ALJ's findings that were not posited by the ALJ).

The Commissioner opines that because the occupational base at all exertional levels is so massive, it would take an extremely large reduction in the number of available occupations to direct a finding of disabled.  (Def. Brf. at 5) *see also Dollins*, 2008 U.S. Dist. LEXIS 73055 at *11-12 (finding that because base was unskilled work at all exertional levels, nonexertional impairments did not significantly reduce base).  While this may be so, the ALJ did not attempt to support his conclusion with examples or statistics that would permit the court to find that his conclusion was supported by substantial evidence.  *See Dues*, 2010 U.S. Dist. LEXIS 45472 at *19-20.  And, as shown above, many courts have reached the opposite conclusion when it comes to a nonexertional limitation on the claimant's ability to interact with supervisors or co-workers.

As it is the Commissioner's burden at this step to support his findings with substantial evidence, the court believes that the better result is to remand this case back to the ALJ for further development of the record, including VE testimony, to determine whether there are a significant number of unskilled jobs which Boley can perform, given the limitations specifically placed on her by the ALJ.  *See Elias v. Comm'r of Soc. Sec.*, No. 08-14583, 2010 U.S. Dist. LEXIS 13054 at *23 (E.D. Mich. Feb. 12, 2010) (finding lack of "accurate and logical bridge between ALJ's findings and his decision to account only for Plaintiff's mental impairments in

the RFC by limiting him to unskilled work"); *Elliott v. Astrue*, No. 09-1633, 2010 U.S. Dist. LEXIS 81788 at *28-29, 2010 WL 3212017 (W.D. Wash. July 22, 2010) *adopted by* 2010 U.S. Dist. LEXIS 81779, 2010 WL 3212013 (W.D. Wash. Aug. 12, 2010) (remanding to ALJ for either explanation of use of the grids or taking VE testimony).

    2.    *The ALJ's Failure to Consider Boley's Mild to Moderate Difficulties in CPP*

Boley next argues that the ALJ's RFC assessment is not supported by substantial evidence because it failed to take into account her mild to moderate difficulties in CPP. When addressing alleged mental impairments, the ALJ must perform a detailed analysis at Step Three to determine whether the alleged impairment meets or medically equals the criteria of listings 12.04 and 12.08. To satisfy listing 12.04, the ALJ must find that under paragraph (A), the claimant has one of a number of various mental symptoms, coupled with, under paragraph (B), marked limitation in two out of the following four areas: activities of daily living; social functioning; CPP; or repeated episodes of decompensation, each of extended duration. Alternatively, the ALJ can find the required symptoms under (A), coupled with other various criteria listed in paragraph (C). Here, the ALJ found that Boley had mild difficulties in activities of daily living, moderate difficulties in social functioning and "mild to moderate difficulties" in CPP. (Tr. 19).

20 CFR § 416.945 states that "[w]hen you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of subpart P of part 404 of this chapter, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity." Boley argues that the ALJ erred by failing to incorporate her CPP limitation into the RFC. Mild limitations do not require incorporation into an RFC assessment. *See Carrigan v.*

*Astrue*, No. 10-303, 2011 U.S. Dist. LEXIS 109460 at *22, 2011 WL 4372651 (D. Vt. Aug. 26, 2011) *adopted by* 2011 U.S. Dist. LEXIS 105982, 2011 WL 4372494 (D. Vt. Sept. 19, 2011) (finding that mild restrictions did not require incorporation into RFC). And Boley does not argue that her mild limitation in activities of daily living should have been incorporated. However, there seems to be a difference when the limitation is deemed "moderate." Though the ALJ here classified Boley's CPP limitation as "mild to moderate," such a classification does not exist under the regulations. Thus, this court finds that it must address Boley's CPP limitation as if it were at its highest classification, or "moderate."

Here, the ALJ did not explain why he incorporated Boley's moderate limitation in social functioning into his RFC assessment, but not her moderate CPP. This is an issue this court need not reach, however, because even if the ALJ's decision to not incorporate this limitation into his RFC is supported by substantial evidence, the court still finds that the ALJ's reliance on the grids in light of this limitation was error.

The bulk of the case law in this area deals with the adequacy of hypotheticals posed to a VE when a nonexertional limitation is present, so the court will begin there. Courts in this Circuit have gone both ways on the question of whether an ALJ errs when he or she does not incorporate a moderate limitation in CPP, which may or may not be incorporated into the RFC assessment, into questions posed to the VE. For example, the court in *Green v. Comm'r of Soc. Sec.* held that so long as the ALJ has found a moderate limitation in mental functioning at Step Three, he must include that limitation, in some form, in the hypothetical questions posed to the VE. *See Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 U.S. Dist. LEXIS 65355 at *29, (E.D. Mich. June 30, 2009) *adopted by* 2009 U.S. Dist. LEXIS 65349, 2009 WL 2365557 (E.D. Mich. July 28, 2009) (finding that "'moderate' concentration problems, even if not severe

enough under the regulations to meet the listing . . . need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5"); *see also Bielat v. Comm'r of Soc. Sec.*, No. 02-70791, 2003 U.S. Dist. LEXIS 11722 at *31 (E.D. Mich. Jan. 29, 2003) *adopted by* 267 F. Supp. 2d 698 (E.D. Mich. 2003) (finding that once ALJ makes determination that claimant "often" has CPP deficiencies, "he must craft a hypothetical question which encompasses, in concrete terms, the substance of that finding"). This is so regardless of whether the ALJ included the limitation in his RFC assessment. *Green*, 2009 U.S. Dist. LEXIS 65355 at *18-19, *29 (moderate limitation in CPP, though not included in RFC assessment, still required to be included in hypothetical).

On the other hand, in *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 U.S. Dist. LEXIS 131437 (E.D. Mich. Feb. 24, 2009) *adopted by* 2009 U.S. Dist. LEXIS 33265, 2009 WL 1044836 (E.D. Mich. Apr. 20, 2009) the court found that the ALJ's hypothetical to the VE which included a limitation of simple, routine, and unskilled work sufficiently accounted for the claimant's moderate limitation in CPP. Courts have found "there is no bright-line rule," rather the court "must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, No. 10-12519, 2011 U.S. Dist. LEXIS 77117 at *22, 2011 WL 2682682 (E.D. Mich. May 17, 2011) *adopted by* 2011 U.S. Dist. LEXIS 74293, 2011 WL 2682892 (E.D. Mich. July 11, 2011); *Hernandez v. Comm'r of Soc. Sec.*, No. 10-14364, 2011 U.S. Dist. LEXIS 108556, at *30, 2011 WL 4427225 (E.D. Mich. Aug. 30, 2011) *adopted by* 2011 U.S. Dist. LEXIS 108186, 2011 WL 4406346 (E.D. Mich. Sept. 22, 2011).

This concept was recently examined in *Hicks v. Comm'r of Soc. Sec.*, No. 10-13643, 2011 U.S. Dist. LEXIS 136810, 2011 WL 6000714 (E.D. Mich. Aug. 30, 2011) *adopted by* 2011 U.S. Dist. LEXIS 136052, 2011 WL 6000701 (Nov. 28, 2011). The court thoroughly digested

the case law in this district and determined that the cases generally fall into two categories – those where a medical expert has found a moderate limitation in CPP, and those where the ALJ specifically found such a limitation, whether or not there was such a finding by a medical expert. *Id.* at *21-28, *23 n.3 (collecting cases).  In the latter class of cases, in which this case falls, the ALJ must incorporate the CPP limitation, in some way or form, into the hypothetical questions asked of the VE.  *Hicks*, 2011 U.S. Dist. LEXIS 136810 at *23-24 (collecting cases).[4]  However, here, after determining that Boley had a moderate impairment in CPP, the ALJ could not ask the necessary question of the VE because he received no VE testimony, and instead relied solely on the grids.

It is noteworthy that the constant vein running through all of the above-cited cases, as well as the cases the Commissioner cites in his brief,[5] is whether the hypothetical questions posed to the VE were sufficient or not, not whether hypothetical questions should have been posed in the first place.  In all of these cases, regardless of how the hypothetical was characterized, a VE was present at the hearing to listen to the testimony, including the limitations found by the ALJ, and testify about what jobs the claimant could or could not perform given those limitations.  *See Latarte*, 2009 U.S. Dist. LEXIS 13147 at * 10 n.4 (noting that while a VE

---

[4] While in *Hicks*, the ALJ, unlike here, made no specific finding of the effect of the limitation on the claimant's ability to work despite the impairment, (*see Hicks*, 2011 U.S. Dist. LEXIS 136052 at *16), other courts have found that the conclusory statement that the claimant's limitations do not significantly erode the occupational base is insufficient without evidence supporting it.  *See Cox*, 2010 U.S. Dist. LEXIS 81134 at *28; *Hammons v. Astrue*, No. 09-33, 2010 U.S. Dist. LEXIS 434 at *15-16, 2010 WL 58913 (E.D. Ky. Jan. 5, 2010); *Sweeney v. Astrue*, No. 10-1038, 2010 U.S. Dist. LEXIS 137351 at *5-6, 2010 WL 5559134 (N.D. Ohio Dec. 8, 2010) *adopted by* 2010 U.S. Dist. LEXIS 137360, 2010 WL 5464735 (N.D. Ohio Dec. 29, 2010).

[5] *Taylor*, 2011 U.S. Dist. LEXIS 77117 at *25-26 (VE testimony taken, though court found that failure of ALJ to pose concentration limitation in hypothetical not error where insufficient evidence supporting a limitation); *Infantado v. Astrue*, 263 Fed. Appx. 469 (6th Cir. 2008) (VE testimony taken, but court found that ALJ need only incorporate limitations into hypotheticals that are deemed credible).

is not qualified to opine on claimant's medical limitations, the fact that he was present at the hearing permitted him to "be aware of claimant's medical limitations before he identified the types of jobs that the Plaintiff could still perform").

While it appears (*see* Plt. Brf. at 5) that a VE was present at the hearing, he or she was never called to testify.  Instead, the ALJ relied exclusively on the grids, despite Boley's nonexertional limitations, to render a finding of "not disabled."  *See Thompson v. Astrue*, No. 10-1688, 2011 U.S. Dist. LEXIS 84542 at *34-37, 2011 WL 3298904 (N.D. Ohio Aug. 2, 2011) (holding that ALJ erred in not calling a VE despite finding claimant had moderate CPP and social interaction limitations); *but see*

The ALJ's RFC assessment limiting Boley to "unskilled" work as a general category does not adequately account for the moderate difficulty in CPP he found.  While an analogy could be drawn between posing a question to a VE that simply limits a claimant to unskilled work and categorically limiting a claimant to unskilled work without the testimony of a VE, the court finds such an analogy lacking.  It is true that courts have found that questions to a VE describing hypothetical work as "simple,"[6] "rote type job tasks,"[7] or ones with "one-, two-, or three-step instructions,"[8] or that are "routine,"[9] "repetitive,"[10] "low stress,"[11] or do not involve

---

[6] *Reynolds v. Comm'r of Soc. Sec.*, No. 10-11044, 2011 U.S. Dist. LEXIS 100039 at *27, 2011 WL 3897793 (E.D. Mich. Aug. 19, 2011) *adopted by* 2011 U.S. Dist. LEXIS 99978, 2011 WL 3897792 (E.D. Mich. Sept. 6, 2011); *but see Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009) (finding hypothetical with simple, routine tasks with one or two steps insufficient to capture moderate limitation in CPP); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930-31 (E.D. Mich. 2005) (finding limit to simple and routine in hypothetical insufficient).

[7] *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 805 (E.D. Mich. 2005).

[8] *Hernandez*, 2011 U.S. Dist. LEXIS 108556, at *32; *but see Ramirez v. Barnhart*, 372 F.3d 546, 554 (3rd Cir. 2004) (finding that limitation to one- or two-step tasks in hypothetical was not sufficient to account for limitation that claimant often had difficulties in CPP); *Brown*, 672 F. Supp., 2d at 797 (same).

"high quotas,"[12] are sufficient to account for a moderate deficiency in CPP, because these terms are often deemed synonymous with the definition of unskilled work.  However, the court has found no case in this Circuit where a mere categorical limitation to unskilled work, without any further qualification, has been deemed sufficient.  *See Elias*, 2010 U.S. Dist. LEXIS 13054 at *18 (finding that "no cases have upheld a limitation to merely unskilled work or a simple recitation of a medical diagnosis"); *see also Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 805 (E.D. Mich. 2005) (noting that court had earlier remanded case back to ALJ where ALJ failed to account for nonexertional limitations in questions to VE, instead finding sufficient a general restriction to unskilled work).  Thus, the court concludes that the ALJ's decision to rely exclusively on the grids to determine Boley's disability status, despite her nonexertional limitations, was error requiring remand.

Even if the court could find that Boley's CPP limitation, taken alone, would not significantly erode the occupational base of unskilled work at all exertional levels, the effect of this nonexertional limitation in combination with her RFC limitation to infrequent interaction with co-workers, supervisors and the public would still lead this court to hold that the ALJ could

---

[9] *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001); *Roberts v. Comm'r of Soc. Sec.*, No. 10-14064, 2011 U.S. Dist. LEXIS 108457 at *20, 2011 WL 4407221 (E.D. Mich. Aug. 8, 2011) *adopted by* 2011 U.S. Dist. LEXIS 108459, 2011 WL 4406344 (E.D. Mich. Sept. 22, 2011); *Stokes v. Comm'r of Soc. Sec.*, No. 09-12722, 2010 U.S. Dist. LEXIS 110082 at *22, 2010 WL 4063886 (E.D. Mich. July 23, 2010) *adopted by*  2010 U.S. Dist. LEXIS 110077, 2010 WL 4063744 (E.D. Mich. Oct. 14, 2010); *Reynolds*, 2011 U.S. Dist. LEXIS 10039 at *27; *but see Edwards*, 383 F. Supp. 2d at 930-31.

[10] *Roberts*, 2011 U.S. Dist. LEXIS at *20; *Reynolds*, 2011 U.S. Dist. LEXIS 10039 at *27.

[11] *Smith,* 307 F.3d at 378 (6th Cir. 2001); *Stokes*, 2010 U.S. Dist. LEXIS 110082 at *22; *but see Bielat*, 2003 U.S. Dist. LEXIS 11722 at *37 (finding that limitation of "unskilled" or "low-stress" does not adequately account for moderate limitation in CPP).

[12] *Smith* 307 F.3d at 378.

30

not properly support reliance on the grids in the absence of other reliable evidence.

   3.  *Boley's New Evidence*

  Finally, Boley argues that this case should be remanded, pursuant to sentence six of the Act, for the consideration of new evidence that was not available at the time the ALJ rendered his decision, specifically the disability listing form submitted by Boley's treating psychiatrist, Dr. Ulano.  To the extent the court's recommendation, outlined above, is accepted, and this case is remanded back to the ALJ for consideration of VE testimony, the court believes it would be beneficial for the ALJ to consider this new evidence simply to create a full and complete record. However, if the recommendation to remand pursuant to sentence four of the Act is not accepted, the court finds insufficient grounds to recommend remand solely to consider this new evidence.

  To merit remanded back to the ALJ for the consideration of new evidence, the evidence must be material, and good cause must be shown as to why it was not presented at the prior proceeding.  42 U.S.C. § 405(g); *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).  Boley has failed to meet her burden here.

  While she claims that the evidence "was not created" until after the ALJ rendered his opinion, (Plt. Rply. at 4), she does not explain what prevented it from being created earlier, especially given that Dr. Ulano had been Boley's treating psychiatrist since 2008 and the hearing was held in 2009.  Other of Dr. Ulano's treating records were available to the ALJ at the hearing. Furthermore, there is no evidence that Boley attempted to keep the record open while attempting to obtain this evidence.  *See Willis*, 727 F.2d at 524.  Thus the court finds that Boley has failed to satisfy the requirement of good cause.

In addition, the court finds that the newly proffered evidence is sufficiently material to warrant remand.  The Sixth Circuit has held that for new evidence to be material there must be "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).  The new evidence Boley seeks to admit is a disability listing checklist, filled out by Dr. Ulano, whose check marks place Boley squarely within a listed disability.  While a treating physician's opinion is entitled to great weight, even controlling weight in many instances, this is only so if the opinion is supported by sufficient clinical findings and is consistent with the other evidence in the record.  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994).  Boley's new evidence fails both tests.

First, the opinion is not supported by sufficient clinical findings.  Dr. Ulano merely checked off boxes on the form to indicate that Boley satisfied the requirements for listing § 12.05 "personality disorder" and almost satisfied the listing for § 12.04 "affective disorder" (she was missing one depressive syndrome characteristic).  Dr. Ulano checked boxes stating that Boley had marked limitations in activities of daily living, social functioning and CPP.  However, Dr. Ulano did not support any of these findings with any evidence in her treating record or any new observations from more recent treatments.  More recent treatment records of Dr. Ulano did not accompany this form.  Indeed, it appears from the record that Dr. Ulano stopped treating Boley in December 2008, almost a full year before authoring this checklist, so it is not even clear that Dr. Ulano was a treating physician at this time, let alone whether she had observed a marked decline in Boley's condition from her last treatment of record.  Thus, sufficient clinical findings do not support the limitations Dr. Ulano recorded on this form.  *Reid v. Astrue*, No. 10-58, 2011 U.S. Dist. LEXIS 72920 at *28, 2011 WL 2669301 (M.D. Tenn. July 7, 2011) (holding that a

32

check-box form by a treating physician was not entitled to great weight when not supported by other evidence or even physician's own treating records).

Second, Dr. Ulano's proffered opinion is contrary to the medical evidence in the record. This form is strikingly similar to the form filled out by Nurse Watson, to which the ALJ declined to give any weight, finding it "inconsistent with the overall medical evidence of record and not even supported by specific findings." (Tr. 22). Because the ALJ already determined that a similar diagnosis by Nurse Watson was contrary to the evidence in the record, this court finds that the ALJ would almost certainly have disregarded Dr. Ulano's form, despite the fact that it came from what could possibly be considered a treating physician. *See Perkins v. Apfel*, 14 Fed. Appx. 593 (6th Cir. 2001) (finding that ALJ would have "undoubtedly" discounted treating physician's opinion when it was a list of limitations unsupported by clinical findings and contrary to record medical evidence).

Accordingly, the court finds insufficient grounds to recommend remand solely to consider the new evidence proffered by Boley.

## III.   CONCLUSION

For the foregoing reasons, the court recommends GRANTING IN PART AND DENYING IN PART Boley's Motion for Remand Pursuant to Sentence Four and Six of the Act [12], DENYING the Commissioner's Motion for Summary Judgment [15], and REMANDING this case to the ALJ for further proceedings consistent with this recommendation.

Dated: February 10, 2012                      s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but

are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 10, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

34